# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Scott Spaulding,

                Petitioner,      Case No. 13-cv-10131

v.                            Judith E. Levy
                            United States District Judge

Jeffrey Larson,

                Respondent.

_____/

## OPINION AND ORDER GRANTING THE PETITION FOR THE WRIT OF HABEAS CORPUS [1]

Petitioner Scott A. Spaulding is a state prisoner, currently confined at the Central Michigan Correctional Facility in St. Louis, Michigan. On April 8, 2010, following a jury trial in Wexford County Circuit Court, he was convicted of one count of first-degree criminal sexual conduct, Mich. Comp. Laws § 750.520b(1)(b), and three counts of second-degree criminal sexual conduct, Mich. Comp. Laws § 750.520c(1)(b), for sexually abusing his stepdaughter. On May 24, 2010, he was sentenced to concurrent terms of six to thirty years of imprisonment for the first-degree criminal sexual conduct conviction

and three to fifteen years of imprisonment for the second-degree criminal sexual conduct convictions.

After exhausting his state remedies, Petitioner filed this petition for the writ of habeas corpus, arguing in relevant part that the Michigan Court of Appeals unreasonably denied his claim of ineffective assistance of counsel under the Sixth Amendment. For the reasons set forth below, the Court agrees that Petitioner's Sixth Amendment right was violated. The petition is granted, and the State is required to release Petitioner or begin a new trial within ninety days.

## I.  Background

At trial, Petitioner's stepdaughter ("P.S."), who was then sixteen years old, testified that Petitioner sexually assaulted her on numerous occasions in 2007 and 2008, when she was fourteen and fifteen years old. P.S.'s biological parents are divorced, and she was living with Petitioner (her stepfather) and mother when the alleged abuse began. The investigation that led to Petitioner's prosecution began in August 2009, when P.S. first told others that she had been sexually abused.

### a. Preliminary examination

A preliminary examination was held on October 27, 2009, approximately one year after P.S. first reported that Petitioner had sexually abused her. (*See* Dkt. 9-2.) At the preliminary examination, the attorney for the State asked P.S. when the sexual abuse first began, and she responded: "In December or January – December of 2007, January 2008." (*Id.* at 6.) When asked if anything happened "prior to that," P.S. responded no. (*Id.*) P.S. testified as to several specific incidents of unlawful sexual conduct between May and June of 2008, which formed the basis of the criminal charges. (*Id.* at 6-8.) On cross-examination, P.S. was asked to affirm that her "testimony [wa]s that the first event of any type was December of '07," to which she responded unequivocally yes. (*Id.* at 27.)

P.S. also testified about the first time she spoke out about the alleged abuse. (*Id.* at 19.) According to P.S., she was babysitting at the home of Nicole and James Humphreys in August 2009. (*Id.*) She was "watching a TV show called Degrassi," in which a similar situation of abuse was portrayed, and she "got [] all worked up, and [she] told [Ms. Humphreys] that [they] had to talk." (*Id.*) P.S. testified that Ms.

Humphreys "ended up telling [Ms. Humphreys' husband], [']cause he was at work." (*Id.*)

P.S. testified that she had been interviewed over the course of the investigation by officers at the Wexford County Sherriff's office, Child Protective Services, and Barbara Cross of the Maple Clinic, who has an M.A. in social work and later testified as an expert witness for the prosecution. (*See id.* at 21-23.)

### b. Trial

At the start of trial, before any witnesses had testified and while the jury was not present, the trial judge noted that he was "somewhat concerned because the information alleges [*sic*] and [he] read it to the jury, that [the relevant timeframe was] between May of '08 and June 26 of '08." (*Id.* at 140-41.)   P.S. had testified during her preliminary examination that no unlawful sexual acts had occurred prior to December 2007, but she later raised allegations that the unlawful sexual conduct began as early as August of 2007, and the prosecution intended to introduce testimony as to those acts under Mich. R. Evid. 404(b).   (*See id.*)   The prosecutor noted that he "didn't do the

4

preliminary examination," and "the information probably should be amended to a much larger range."

The prosecution first called Wexford County Deputy Sheriff Jason Nehmer to testify. Nehmer testified that on August 15, 2009, he took an incident report from P.S. and her father at the Wexford County Sheriff's Department. (Dkt. 9-3 at 167.)[1] According to Nehmer, P.S. was "very quiet, [and] seemed very timid." (*Id.*) Nehmer testified that P.S. "was really nervous, um, didn't really, you know, want to open up right away," but "she knew that she had to, you know, say something." (*Id.* at 168.) Nehmer testified that P.S. "advised that [Petitioner] had a very bad temper, um, and that he had a number of guns, and that she had feared that if something went bad that he might use his temper and the guns." (*Id.* at 169.)

The prosecution next called Nicole Humphreys to testify. Humphreys testified that she had known P.S. for seven years and that P.S. had been a babysitter for her children for approximately three or four years. (*Id.* at 175.) According to Humphreys, on or around August

---

[1] The prosecution referred to August "of this year" (Dkt. 9-3 at 167), but the only logical time would have been August of the preceding year, 2009, given that the trial took place in April of 2010.

5

10, 2009,[2] P.S. was being "snippety," "grouchy," and "rude." (*Id.* at 176.) When Humphreys asked P.S. if everything was ok, she said no, began crying, and "her whole body was shaking." (*Id.* at 177.) Humphreys testified that P.S. told her that Petitioner had "done things to [her]." (*Id.* at 178.) Humphreys telephoned her husband, who came home, and the two advised P.S. that she needed to tell her mother and father or they would talk to her parents. (*Id.* at 178-81.)

The prosecution next called Ericka Szegda, P.S.'s stepmother, to testify. The prosecution asked Szegda whether Petitioner had a temper, to which she responded yes, (*id.* at 189), and then asked Szegda to describe several specific incidents in which Petitioner had lost his temper. (*Id.* at 189-93.) The prosecution also asked Szegda whether P.S. came "home with a bathing suit one day" and whether there was "[a]nything unusual about" it. (*Id.* 193.) Szegda answered that "it was way too small." (*Id.*) On cross-examination, defense counsel elicited testimony that Szegda thought of P.S. "as a happy and outgoing child"; that even though they were close, P.S. did not disclose the alleged abuse to Szegda until after she first made the allegations in 2009; that

---

[2] *See supra* note 1.

Szegda's home was closer to P.S.'s school than Petitioner's; and that P.S. was allowed to play more sports when living in Szegda's home than when living in Petitioner's. (*Id.* at 195-99.)

The prosecution next called P.S., who testified that Petitioner committed the following sexual acts. When she was fourteen, around August of 2007, Petitioner manually stimulated her for approximately ten minutes while they were lying on the couch watching a movie. (*See id.* at 212-15.) "[A]bout a month later," Petitioner took her right hand and made her manually stimulate him for approximately five minutes while they were lying on the couch watching a movie. (*See id.* at 215-18.) On another occasion, Petitioner manually stimulated her for approximately five to ten minutes while her mother slept in the same bed. (*See id.* at 221-25.) Petitioner orally stimulated and penetrated her, and she was unsuccessful in her attempts to push him away. (*See id.* at 226-30.) When she was visiting during December 2007 to January 2008, after she had moved in with her father, Petitioner

manually stimulated her and told her that he missed "his partner in crime" and that "he love[d] [her] so much." (*See id.* at 230-34.)[3]

The State asked P.S. whether she "kind of get[s] confused about these dates," to which the she replied yes. (Dkt. 9-3 at 226.) Asked why, P.S. replied "[b]ecause it's happened so many times that it's -- I don't like to keep track of the dates that he's done this. I try to put it behind me. And so the dates, they're not clear." (*Id.*) Asked whether she "tr[ies] to block it out," P.S. responded yes. (*Id.*)

On cross-examination, P.S. was asked why her testimony regarding the first incident of sexual assault was a different time and incident than the one she reported to the police during the investigation, and she replied that she "was really scattered that day," when she "said something, [she] remembered something else," and "when [she] was talking to [the officer], [she] was really, really scattered on where the stories were." (*Id.* at 272-73.) When asked whether she would admit that her "stories have changed each time [she] talked

---

[3] P.S. also testified about incidents in which Petitioner made inappropriate comments or gestures, such as exposing his genitals to her (see *id.* at 210), telling her she needed to shave her genitals (see *id.* at 234), and asking to view her in a revealing bathing suit. (*See id.* at 241-42.)

8

about this," P.S. responded that only "[t]he dates, not the actual stories" changed. (*Id.* at 273.)

P.S. also testified that after moving in with her father, and despite Petitioner's conduct, she called Petitioner and asked him to drop off items for her at school (*id.* at 258-59), took him cookies at work (*id.* at 259-62), and on occasion voluntarily stayed alone with Petitioner at his home when her mother was not there. (*Id.* at 264-66.) She also testified that she wanted to live with her father because Petitioner and her mother had rules at their house that she did not like, for example, that she could only play one sport and that she could not have certain friends over to visit. (*Id.* at 256.) P.S. also testified that she did not like how she was treated, in part because Petitioner and her mother told her that she was lazy. (*Id.*) P.S. confirmed that she had reported the sexual abuse more than one year after the final alleged incident had occurred. (*Id.* at 268-69.)

At the start of the second day of trial, the prosecution moved to amend the criminal information to expand the timeframe from that alleged in P.S.'s initial statement to "the more extensive statement[,] which would have been October '07 through December of '08." (Dkt. 9-4

9

at 4.) The prosecution argued that "this should not come as a surprise to the defense," because "there was grave confusion about dates and we are dealing with a younger victim and also a sexual assault case that most people would have a difficult time pinning down dates and times." (*Id.* at 5.) Defense counsel responded that his client would be prejudiced because during the preliminary examination, P.S. was asked "[d]id anything happen prior to" December 2007 to January 2008, and P.S. responded unequivocally no. (*Id.* at 10.) The prosecution replied that P.S. "has not been able to pinpoint dates and times," and was "confused about a lot of things." (*Id.* at 18.)

The trial court judge ultimately granted the prosecution's motion, noting that "we have the classic case of a young child who is, by her testimony if to be believed, was subjected to serious trauma," and "her coping mechanism in dealing with this was to attempt to suppress the memories of these events, and I'm certain that she ha[d] done so until such time as she revealed them [and was] required to now to [*sic*] recite the incidents." (*Id.* at 28-29.) The trial court judge found that the defense was not prejudiced because "the prosecution has provided pursuant to statute and rule of evidence 404(B) [*sic*], a recitation of a

broader range of dates and events than were testified to at the preliminary examination, and I believe that the defense is properly on notice for those." (*Id.* at 29.)

The prosecution then called Dezirae Hesselink, a friend of P.S. from school. The prosecution elicited testimony from Hesselink that P.S. had sent her an "Instant Messag[e]" that P.S.'s "step dad abused her." (*Id.* at 46.) Hesselink testified that she told P.S. to tell her father, but P.S. responded that "her dad might get mad at her because he asked her if [Petitioner had] ever done anything to her." (*Id.* at 47.)

The prosecution then called Detective Lieutenant Trent Taylor of the Wexford County Sheriff's office, who testified that, after receiving the sexual assault complaint from Deputy Sheriff Nehmer, he interviewed Petitioner on August 17, 2009. (*Id.* at 52-53.) According to Taylor, he had asked Petitioner if P.S. had touched his genitals, and Petitioner had responded that he did not know. (*Id.* at 63.) Taylor testified that he had asked Petitioner if P.S. was "well developed now," and Petitioner had responded "oh, yes," and that she was a "beautiful young lady." (*Id.* at 67, 70.) Taylor also testified that Petitioner had said that P.S. had seen his penis while he had been in the bathroom and

11

possibly when he had urinated off of a deck. (*Id.* at 75.) When Taylor asked Petitioner if P.S. had "ever physically manipulated his penis," Taylor testified that Petitioner had "indicated that he's a hard sleeper." (*Id.* at 76-77.)

Finally, the prosecution called Barbara Cross to testify as an expert witness. Cross had previously interviewed P.S. during the investigation. Cross testified that she had a Master's Degree in social work and was the director of and a therapist for the Maple Clinic (a private outpatient mental health clinic). (*Id.* at 129-34.) Cross testified that delayed disclosure of traumatic events is "very common" in both adults and children, and the delay could be "a week, or a month, or a year, or even a decade." (*Id.* at 135-36; *see also id.* at 150 ("It depends on the child, but there's always a delayed disclosure.").) She also testified that if a victim has an emotional investment with the perpetrator, such as a family member might have, then "there's far more investment in keeping the secret; quite frankly to keep the peace is one reason." (*Id.* at 136.) According to Cross, other reasons children do not report abuse include embarrassment, shame, guilt, and "fear of what other people are going to say." (*Id.* at 137-38.) Cross testified that

12

it does not take much for a child to become fearful, and children are often kept silent regarding the abuse through bribery. (*Id.* at 147-48.)

Cross also testified that it is "very common" for victims to be inconsistent about times, dates, who is present in the home, and where they lived at the time of the abuse because "most kids don't document dates and times of when they're being abused." (*Id.* at 142-43.) According to Cross, children do not necessarily want to get away from a perpetrator who is a family member because they "covet and protect that person" and "don't want the whole world to find out." (*Id.* at 148-49.) Cross testified that it would not be "that so far off the grid" for a victim to make her abuser his favorite cookies because she would not want other people to know of the abuse and would try to lead a normal life. (*Id.* at 149-50.) And Cross testified that victims who have been removed from abusive environments may want to return for the same reasons. (*Id.* at 150-51.)

On cross-examination, and in front of the jury, Petitioner's counsel did not challenge Cross' credentials to testify as an expert. In fact, he even stated that he was "sure [her résumé was] long and very distinguished," noted that Cross had "been admitted as an expert

witness a number of times in a number of cases," and noted that "obviously [she was] well verse [*sic*] in this in terms of what may be seen in these types of situations where a child claims she has been sexually abused." (*Id.* at 157, 159; *see also id.* at 161 ("[TRIAL COUNSEL]: Well Judge, I think the Court has already ruled that [Cross is] an expert. I have no objection to her qualifications.").) Cross testified that she agreed that "some reports of sexual abuse by alleged victims turn out to be not truthful," and "there can be reasons why an alleged victim may report that . . . he or she had been abused and ultimately it turns out to be not true." (*Id.* at 157.) Cross also testified that she had never been asked to testify for a criminal defendant. (*Id.* at 158-59.) Finally, Cross acknowledged that her testimony was generic and "[n]ot about any specific case at all." (*Id.* at 160.)

The defense called three witnesses, but no rebuttal expert witness: Meghan Nagel (P.S.'s aunt, the sister of P.S.'s mother), Michelle Spaulding (P.S.'s mother and Petitioner's wife), and Petitioner. The trial court limited the witnesses the defense could call and the testimony defense counsel could elicit because counsel had failed to timely file a witness list. (*See* Dkt. 9-3 at 138-40.)

14

Spaulding testified that during the relevant period, "there was always somebody in the home besides [Petitioner] and [P.S.]" in the evenings, specifically, Spaulding or Petitioner's son from his previous marriage, Payne Spaulding. (Dkt. 9-4 at 208-09.) Spaulding also testified that the reason P.S. had gone to live with her father was that he "lived right up the road from the school that allowed her more opportunities in sports," and P.S. "didn't like the rules at the house." (*Id.* at 212-15.) When asked whether she had ever seen "any improper touching of [P.S.] by [Petitioner]," Spaulding responded "[n]ever." (*Id.* at 215.) Spaulding also testified that P.S. never "t[old] [her] that she had been improperly touched or abused by [Petitioner]." (*Id.*)

On direct examination, defense counsel asked Petitioner about each of P.S.'s allegations of unlawful sexual conduct, and Petitioner denied each one. (*See id.* at 236-40.) On cross-examination, the prosecution asked Petitioner whether he "went with [P.S.] to get a bikini," and Petitioner responded that he had. (*Id.* at 240.) The prosecution also asked whether Petitioner had "referred to [P.S.] as a snuggle ball," and he responded that he had. (*Id.* at 242.) The prosecution asked Petitioner: "you don't think that it's inappropriate for

a grown man to spoon with a [fourteen] year old girl?" to which Petitioner responded "I wasn't spooning with her. She was laying [*sic*] next to me." (*Id.* at 246.) Pressed whether "that [would] go for any female . . . , any [fourteen] year old," Petitioner responded no, but that he thought of P.S. as his daughter. (*Id.* 246-47.)

At one point, the prosecution addressed Petitioner by saying: "Sir, stop the manipulation if you can, please. Please. Answer my question, stay with the question. Understand?" (*Id.* at 248.) At another, the prosecution addressed Petitioner by saying: "Sir, we don't need the unasked answers and the actor looking over at the jury and pointing to them. I asked you a simple question." (*Id.*) The question was in reference to whether Petitioner had expressed during the investigation that he wanted to kill himself. Defense counsel did not object to any of these assertions.

The jury convicted Petitioner on all counts (Dkt. 9-5 at 106-07), and Petitioner was sentenced to concurrent terms of six to thirty years' and three to fifteen years' imprisonment. (Dkt. 9-6 at 22.)

16

### c. Direct appeal

Following sentencing, Petitioner filed a motion to remand for an evidentiary hearing to develop the factual record regarding his ineffective assistance of counsel claim. (*See* Dkt. 9-7 at 19-28.)   In relevant part, Petitioner attached an offer of proof regarding testimony that would be presented by Dr. Katherine Keefer Okla, M.A. and Ph.D., Clinical Psychology (child and adolescent specialty), and testimony that would establish that Petitioner's trial lawyer did not consult with any psychologists or psychiatrists in preparation for the case, among other failures. (*See id.* at 25, 242-44.)

Petitioner's appellate counsel consulted with Dr. Okla, who reviewed the following: the investigative report by Detective Taylor, including the summary of the interview by Deputy Nehmer; the transcript of the interview of Petitioner by Taylor (8/17/09); the transcript of the interview of Michelle Spaulding by Taylor (8/17/09); the Child Protective Services investigative report, including the summary of the interview of P.S. by CPS employee Jamie LeMay (8/19/09); the "Sexual Abuse Evaluation" report summarizing the interview of P.S. by Barbara Cross (10/05/09); the transcript of P.S.'s

preliminary examination testimony (10/2709); the transcript of P.S.'s trial testimony; the transcript of Petitioner's trial testimony; the transcript of Michelle Spaulding's trial testimony; the transcript of Cross's trial testimony; and Cross's résumé. (Dkt. 9-7 at 85.)

Dr. Okla found that P.S.'s "statements were unreliable for many reasons," including that the "investigative process was sufficiently flawed from the beginning" such that "it is highly likely the 'evidence' as embodied in statements made by [P.S. were] rendered permanently unreliable." (*Id.* at 86-87.) According to Dr. Okla, "there are indications of unreliability and memory problems in [P.S.'s] reports, including inconsistencies within and between reports, lack of specificity, and multiple sources of post-event contamination." (*Id.*)

Specifically, Dr. Okla found that P.S.'s statements were unreliable in part because the investigatory process was contaminated as follows:

> In this case, the first formal interview by the Deputy completely violated the Michigan Forensic Interview Protocol, which is mandatory; first, by failing to record the interview; questioning her in her father's presence, a non-neutral environment which is not distraction free (it is unknown whether Deputy Nehmer was in uniform or armed with a weapon during the interview); failing to present guidelines for telling the truth, not guessing, etc.; failing to elicit a practice or free narrative, failing to obtain specific

18

details regarding alleged acts or surroundings; and failing to present, explore or rule out alternative hypotheses, which is the best way to elicit unbiased, complete and accurate information regarding abuse allegations from a child or adolescent.

The second formal interview was conducted a few days later by Child Protective Services worker Jamie LeMay, who also failed to comply with the forensic protocol, or at the very least, failed to provide documentation that she complied with one of the most basic elements: proper recording/memorializing. . . . Given the unambiguous and unambivalent protocols that clearly state multiple interviews are to be avoided at all costs, there is no valid justification for CPS to send [P.S.] for a 3rd formal interview—which occurred weeks later.

(*Id.* at 91.) According to Dr. Okla, an "expert could have alerted defense counsel and provided testimony regarding the significance of this type of bias and the need to obtain complete records regarding the content of the referral information and questions, whether written or verbally." (*Id.*)

Relatedly, Dr. Okla noted that "several decades of empirical research . . . has sometimes yielded significant counter-intuitive results," and that the conclusions drawn from that data are contrary to "what would generally be expected to be true by the average layperson or uninformed mental health professional." (*Id.* at 87.) It would thus

"be important to present expert testimony to assist the fact finder in weighing the evidence (consisting solely of various statements purporting to be recall of past events) by placing it in the context of reliable empirical research." (*Id.*) "An expert witness could provide testimony on the identifying characteristics of children's disclosures of sexual abuse, and certain factors which have a high correlation with inaccurate and even demonstrably false statements," a "phenomenon [] recognized both in the scientific world, and increasingly, by courts throughout the country." (*Id.*)

But here, Dr. Okla concluded, Cross's "expert witness testimony . . . was improper and misleading, in that her involvement and methods clearly violated ethics guidelines and professional practice standards, was misleading to the finder of fact because it was not based on current, valid scientific knowledge, and included factual inaccuracies." (*Id.* at 86-87.) For example, citing current literature in the field, Dr. Okla noted that Cross's testimony that "children often delay, deny, and recant their disclosures of sexual abuse (direct or implied variations of Child Sexual Abuse Accommodation Syndrome) . . . relied on outdated

and unreliable information, incorrectly presented as scientifically valid and reliable." (*Id.* at 94-95.)

According to Dr. Okla, "[g]iven the indications that [P.S.'s] statements to various interviewers were unreliable, the flawed nature of the investigation, and the improper and misleading trial testimony offered by the Prosecutor's 'expert,'" a "Forensic Psychologist . . . could have provided extremely useful assistance to defense counsel both in trial preparation and by offering rebuttal testimony to address inaccurate testimony presented by the State." (*Id.* at 87.) Specifically, Dr. Okla proffered that "[h]ad defense counsel consulted with [her] prior to trial, [she] could have provided the . . . information regarding preparing a thorough defense strategy," including "developing a line of questioning for the witnesses, countering the inappropriate methods and inaccurate testimony by the government's witness, and providing expert witness testimony for rebuttal." (*Id.*)

The Michigan Court of Appeals denied the motion to remand "for failure to persuade the Court of the necessity of a remand at this time." (*Id.* at 155.)

Petitioner filed a motion for reconsideration, reiterating the offer of proof regarding Dr. Okla's proffered testimony and the testimony that would establish his trial lawyer's failure to file a timely witness list or comply with the prosecution's discovery demands, failure to review the court rule on jury selection before one was empaneled, failure to adequately understand the sequestration rule, failure to consult with an independent expert, and failure to object to the scope of Cross's testimony. (*See id.* at 158-67.) The Michigan Court of Appeals denied the motion for reconsideration without explanation. (*Id.* at 211.)

Petitioner then filed an appeal in which he raised several claims of error, including the claim of ineffective assistance of trial counsel relevant to the Court's opinion here, and in which Petitioner again renewed his request to remand the matter to develop the factual record. (*See* Dkt. 9-7.) The Michigan Court of Appeals addressed the renewed request to remand as follows:

> Defendant [] faults trial counsel for not retaining an expert to rebut the testimony of Barbara Cross, the prosecution's proffered expert on child sexual abuse. In support of his claim in this regard, defendant has provided a report prepared by Katherine Keefer Okla, Ph.D., a psychologist, which largely attacks the conduct and testimony of Cross in this case.

22

Much of Dr. Okla's report criticizes the manner in which Cross and others interviewed the victim. The report also discusses how improper victim interviews might lead to false reports of sexual abuse or improperly suggest false memories by the victim concerning the events that actually transpired. However, we note that this is not a case involving a very young child who might be susceptible to being convinced that she was molested by an adult who did not actually molest her. Rather, this is a case in which a 16-year-old girl clearly and particularly accused her stepfather of sexual abuse that included oral sex. As a practical matter, there was no reasonable concern in this case that the victim might have been misled by her interviewers into falsely remembering the facts or falsely accusing defendant of molesting her.[4] Consequently, we cannot conclude that a defense expert's attempt to rebut Cross's testimony would have been a significant factor in the jury's determination of guilt or innocence. It is axiomatic that in order to establish ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that, but for the deficient performance, the result of the proceedings would have been different. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). Defendant simply cannot establish that defense counsel's failure to retain an expert to rebut Cross's testimony was outcome determinative in this matter.

---

4 The state trial and appellate courts have whipsawed Petitioner. On the one hand, it granted, over defense counsel's objection, the prosecution's motion to amend the information because "we have the classic case of a young child" whose "coping mechanism in dealing with this [abuse] was to attempt to suppress the memories of these events." On the other, it undercut the import of Dr. Okla's report on appeal because "this is not a case involving a very young child . . . . [, and] there was no reasonable concern in this case that the victim might have been misled by her interviewers."

Defendant argues that, because Cross testified concerning certain behavioral characteristics of the victim, her testimony was improper.  He also argues that, because Cross testified that defendants often lie in CSC cases, she improperly bolstered the victim's testimony.  We acknowledge that Cross's testimony in this regard may have been improper.  See *People v Peterson*, 450 Mich 349, 374; 537 NW2d 857, amended 450 Mich 1212 (1995).  But this does not present a basis for a remand with regard to defendant's claims of ineffective assistance of counsel because (1) this Court remains able to review the existing record, and (2) trial counsel cannot be considered deficient for failing to have anticipated that Cross would offer such improper testimony and failing to have obtained an expert for the sole purpose of rebutting it.

\* \* \*

For the foregoing reasons, we decline defendant's invitation to remand this matter to the trial court for a *Ginther* hearing.

*People v. Spaulding*, No. 298743, 2011 Mich. App. LEXIS 1310, at \*3-5 (Mich. Ct. App. July 19, 2011).

The Michigan Court of Appeals denied the renewed request for an evidentiary hearing because it found that, even assuming the proffered evidence to be true, Petitioner would not have been prejudiced by trial counsel's alleged deficiencies.  The following is a recitation of the relevant portion of the court's opinion:

24

Nor do we perceive any ineffective assistance of counsel on the existing record. See *People v Jordan*, 275 Mich App 659, 667[] (2007) (observing that when no *Ginther* hearing has been held, "review is limited to errors apparent on the record"). It strikes us that even if trial counsel had timely filed a motion or witness list, retained his own expert to rebut the testimony of Cross, further impeached Cross's testimony, and conducted additional research and investigation prior to trial, the result of the proceedings would have been the same. See *Carbin*, 463 Mich at 600. The victim testified in detail that defendant had performed oral sex on her and had fondled her on several occasions. Defendant then testified in his own defense, denying the victim's allegations and claiming that he had never sexually assaulted her. At the same time, however, defendant admitted during his testimony that he had referred to the victim as "a snuggle ball," that he had laid on the couch and "spoon[ed]" with her on several occasions, that the victim was "cuddly," and that he had "possibly" touched the victim's breasts. It is solely for the jury to assess the credibility of the witnesses and to weigh their testimony. *People v Harrison*, 283 Mich App 374, 378; 768 NW2d 98 (2009). It would be difficult, indeed, to conclude that any additional actions by defendant's attorney could have altered the jury's view of the evidence in this case. On the record before us, we simply cannot conclude that the result of the proceedings would have been different but for the alleged deficiencies of defense counsel. *Carbin*, 463 Mich at 600.

*People v. Spaulding*, 2011 Mich. App. LEXIS 1310, at *5-7.

Petitioner filed an application to the Michigan Supreme Court for leave to appeal, which was denied. *People v. Spaulding*, 808 N.W.2d 782, 782 (Mich. 2012).

## II.   Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court can order habeas relief only if the state's adjudication of a claim on the merits (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.   28 U.S.C. § 2254(d).   When applying these standards, this Court is to examine the holdings of the Supreme Court as they existed at "the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  The Court can, however, look to decisions of other courts to determine whether a legal principle has been clearly established by the Supreme Court.  *Hall v. Vasbinder*, 563 F.3d 222, 232 (6th Cir. 2009); *Smith v. Stegall*, 385 F.3d 993, 998 (6th Cir. 2004).  "A state court's determination that a claim

26

lacks merit precludes federal habeas relief so long as 'fair minded jurists could disagree' on the correctness of that decision." *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

"When a state court relied only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the *Strickland* prong not relied upon by the state court. The unadjudicated prong is reviewed *de novo*." *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012). The Michigan Court of Appeals denied Petitioner's claim on the basis that he had failed to show prejudice, but the court did not reach whether counsel's performance was deficient. *See generally Strickland v. Washington*, 466 U.S. 668, 697 (1984) ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one."). Thus the Court reviews *de novo* whether trial counsel's performance was deficient and reviews under AEDPA's "doubly deferential" standard the Michigan Court of Appeals' holding that Petitioner was not prejudiced.

## III.   Analysis

To establish a claim of ineffective assistance of counsel, Petitioner must show that (a) "counsel's performance was deficient," and (b) the "deficient performance prejudiced the defense." *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

### a. Whether trial counsel's performance was deficient

The "deficient performance" prong of the *Strickland* test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Relevant to this Court's decision, Petitioner argues that the defense mounted by his trial counsel was constitutionally deficient

28

because his lawyer failed to consult with an expert in forensic psychology. (*See* Dkt. 2 at 57-58.)

As set forth above, the State called Barbara Cross as an expert witness for the prosecution. Among other things, Cross testified that delayed disclosure of traumatic events is very common in both adults and children, and it is very common for victims to be inconsistent about times, dates, who is present in the home, and where they lived at the time of the abuse. Defense counsel did not challenge Cross's qualification to testify as an expert witness. Rather, he essentially conceded the validity of her testimony, stating that "obviously [Cross was] well verse [*sic*] in this in terms of what may be seen in these types of situations where a child claims she has been sexually abused." On the record before this Court, defense counsel had not at any time consulted with any potential expert of his own to test the validity of Cross's proffered testimony.

In preparation for the Petitioner's appeal, his appellate counsel consulted with Dr. Katherine Keefer Okla, a clinical psychologist with a child and adolescent specialty, who has provided expert testimony for both the prosecution and defense in numerous child sexual abuse cases.

Dr. Okla extensively reviewed the record and concluded "that there were multiple factors [that] undermine the reliability of not only the complainant's, but the expert witness'[s] testimony," which "should have been identified as part of a thorough and effective defense strategy." According to Dr. Okla, "there are indications of unreliability and memory problems in [P.S.]'s reports, including inconsistencies within and between reports, lack of specificity, and multiple sources of post-event contamination."

Specifically, for example, Dr. Okla highlighted that Cross's failure to record her interview of P.S. or to take contemporaneous notes violated proper forensic interviewing protocols and "compromise[d] the reliability of [P.S.]'s statements to be used as evidence." And citing current scientific literature in the field, Dr. Okla noted that Cross's testimony that "children often delay, deny, and recant their disclosures of sexual abuse (direct or implied variations of Child Sexual Abuse Accommodation Syndrome) . . . relied on outdated and unreliable information, incorrectly presented as scientifically valid and reliable."

Dr. Okla also highlighted other aspects of the investigatory process that likely contaminated the reliability of P.S.'s testimony. For

30

example, Dr. Okla provided that Deputy Nehmer failed to follow the mandatory Michigan Forensic Interview Protocol by questioning P.S. in her father's presence, failing to present guidelines for telling the truth, failing to elicit a practice or free narrative, failing to obtain specific details regarding alleged acts or surroundings, and failing to present, explore, or rule out alternative hypotheses. And according to Dr. Okla, the "unambiguous and unambivalent protocols [] clearly state multiple interviews are to be avoided at all costs," so there was "no valid justification" for CPS employee Jamie LeMay to send P.S. for a third formal interview that occurred weeks later. Petitioner's trial counsel did not raise any of these issues at trial.

The State argues that "it is clear none of the complained of actions or omissions by counsel were outside the wide range of professionally competent assistance." (Dkt. 7 at 46.) According to the State, "[n]o precedent establishes that defense counsel must call a non-psychiatric expert witness or risk falling below the minimum requirements of the Sixth Amendment," and "[c]ounsel may have decided to avoid creating a 'battle of expert witnesses' and instead focus the jury's attention on perceived problems of the prosecution's expert's testimony." (*Id.* at 45.)

31

But it is not just trial counsel's failure to call an expert witness that is at issue. It is his failure even to consult with one in preparation for trial and resulting failure to adequately impeach the prosecution's witnesses, given the circumstances of this case.

"Constitutional competence is not a high bar for an attorney to reach." *Vasquez v. Bradshaw*, 345 F. App'x 104, 115 (6th Cir. 2009). "[A] healthy amount of deference" is given "to counsel's tactical and litigation decisions; they are 'virtually unchallengeable' in the ordinary case." *Id.* (quoting *Strickland*, 466 U.S. at 690). "But this deference to strategic choices has always been tempered by a requirement that the choices themselves be informed: 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 691). "[A] particular decision not to investigate must be directly assessed for reasonableness." *Id.* (quoting *Strickland*, 466 U.S. at 691). When assessing the reasonableness of an attorney's investigation, the Court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable

attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

Petitioner's "claim that his attorney failed to identify key evidence and failed to locate and interview critical witnesses is within the known contours of the duty" to conduct a reasonable pre-trial investigation. *See Vasquez*, 345 F. App'x at 115 (citing *Towns v. Smith,* 395 F.3d 251, 258 (6th Cir. 2005) (duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence"); *Clinkscale v. Carter,* 375 F.3d 430, 443 (6th Cir. 2004) (collecting cases noting that failure to investigate or call potential defense witnesses constitutes constitutionally deficient representation)). The same is true when "the missing evidence alleged . . . is impeachment evidence and not . . . direct evidence of innocence," especially when "there are no direct witnesses to the alleged crime beyond the perpetrator and the victim." *Id.* When the prosecution's case rests entirely on the testimony of the victim, "impeachment evidence is at a premium." *Id.*

"The circumstances ordinarily surrounding an accusation of child sexual abuse underscore this concern for developing impeachment

evidence." *Id.*; *see, e.g.*, *Gersten v. Senkowski*, 426 F.3d 588, 608 (2d Cir. 2005) (medical expert consultation or testimony "is particularly critical to an effective defense in sexual abuse cases where direct evidence is limited to the victim's testimony") (citing *Eze v. Senkowski,* 321 F.3d 110, 128 (2d Cir. 2003); *Pavel v. Hollins*, 261 F.3d 210, 224 (2d Cir. 2001); *Lindstadt v. Keane*, 239 F.3d 191, 197-98 (2d Cir. 2001)). "[T]hese cases frequently hinge on judgments about credibility in which jurors must choose between contradictory stories proffered by the defendants and the complainants," because "third-party witnesses [are] often unavailable." *Vasquez*, 345 F. App'x at 115 (quoting *Eze,* 321 F.3d at 112).

Here, as in *Vasquez*, trial counsel "must have known that there was no plausible defense of [Petitioner] other than attacking [P.S.'s] credibility." *See, e.g.*, *id.* at 116. "The only witnesses to the alleged crime[s] were [P.S.] and [Petitioner], so producing a witness with a different account was impossible. There was no physical evidence for him to counter, or to demonstrate that a different person was involved. There was no possibility of an alibi . . . ." *See, e.g.*, *id.*

And there were "facts [that] were clear and should have pointed [trial counsel] toward the investigation necessary to put on a stronger defense." *See, e.g.*, *id.* For example, P.S.'s "story was never crystal clear, suggesting that perhaps a well-informed cross-examination . . . could have raised a reasonable doubt as to its veracity." *See, e.g.*, *id.* Moreover, other courts have found that "even a minimal amount of investigation into the purported 'Child Sexual Abuse Accommodation Syndrome' would have revealed that it lacked any scientific validity for the purpose for which the prosecution utilized it: as a generalized explanation of children's reactions to sexual abuse, including delayed disclosure and blurred memory." *See, e.g.*, *Gersten*, 426 F.3d at 611.

"[H]ad counsel investigated the possibility of challenging the prosecution's psychological expert, he would have discovered that exceptionally qualified experts could be found who would challenge the scientific validity of the prosecution expert's" testimony. *See, e.g.*, *id.* "Defense counsel's lack of preparation and failure to challenge the credibility of the key prosecution witness could not be based on a sound trial strategy." *See, e.g.*, *id.* (holding that even under the more

35

demanding AEDPA standard, it was an unreasonable application of *Strickland* for the state court to hold otherwise).

The Court's "quarrel is not with trial counsels' decision to forgo calling . . . a[n expert] witness *per se*, but rather with the lack of any reasonable, timely investigation into what she might have offered the defense." *See Brown v. Smith*, 551 F.3d 424, 432 (6th Cir. 2008). Even accepting the State's argument that defense counsel's decision was the result of a conscious strategy, such a strategic decision would be objectively unreasonable. "[N]o facts known to defense counsel at the time that he adopted a trial strategy that involved conceding the medical evidence could justify that concession." *See, e.g.*, *Gersten*, 426 F.3d at 609.

"It is well known in the literature (and the cases cited above) that the credibility of the child witness is often central to the success of child sex abuse prosecutions and that the circumstances surrounding the initial accusation of the abuse are important indicia of credibility." *Vasquez*, 345 F. App'x at 118. But rather than consult an expert of his own, defense counsel accepted Cross as an expert in the field and conceded the validity of her testimony. Moreover, the failure to consult

with an expert hampered defense counsel's ability to impeach the prosecution's witnesses, for example, by failing to highlight Deputy Nehmer's, CPS employee LeMay's, and Cross's violations of the Michigan Forensic Interview Protocol during the investigatory process, which may have rendered P.S.'s testimony unreliable.   Defense counsel's failure to, at a minimum, consult with an expert as to whether Cross and P.S. could be effectively impeached fell "below an objective standard of reasonableness."  *See Strickland*, 466 U.S. at 688.

### b. Whether the Michigan Court of Appeals unreasonably found that Petitioner was not prejudiced

Defense counsel's deficient representation only violated Petitioner's Sixth Amendment right if it resulted in prejudice, although the two prongs are interrelated.  *See Draughon v. Dretke*, 427 F.3d 286, 293 (5th Cir. 2005) ("In our analysis we do not attempt to place the events of trial into two separate airtight containers of the first and second prongs of *Strickland*.  The facts that demonstrate a reasonable probability of a different outcome but for counsel's decisions can cast light on their reasonableness.").  To determine whether Petitioner was prejudiced, the reviewing court must decide, based on the totality of the evidence before the factfinder, whether there is "a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

"This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (quoting *Strickland*, 466 U.S. at 693).  In relevant part, § 2254(d) of AEDPA provides that a federal court can grant habeas relief only if the state's adjudication of a claim on the merits resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d).

In this case, the Michigan Court of Appeals' decision on the prejudice prong was contrary to clearly established law as set forth in the Supreme Court's *Strickland* decision.  The Michigan Court of Appeals stated that "[i]t is axiomatic that in order to establish ineffective assistance of counsel, a defendant must show that . . . but for

the deficient performance, the result of the proceedings *would have been different*." *People v. Spaulding*, No. 298743, 2011 Mich. App. LEXIS 1310, at *4 (Mich. Ct. App. July 19, 2011) (emphasis added). When addressing the merits, the court found that "even if trial counsel had . . . retained his own expert to rebut the testimony of Cross, further impeached Cross's testimony, and conducted additional research and investigation prior to trial, the result of the proceedings *would have been the same*." *Id.* (emphasis added). According to the court, Petitioner "c[ould] not establish that defense counsel's failure to retain an expert to rebut Cross's testimony was *outcome determinative* in this matter." *Id.* (emphasis added). Citing only Michigan case law, the court held that "[o]n the record before us, we simply cannot conclude that the result of the proceedings *would have been different but for* the alleged deficiencies of defense counsel." *Id.* at *6 (citing *People v. Carbin*, 463 Mich. 590, 600 (2001)) (emphasis added).

As the Sixth Circuit has held, "[t]his is not a casual error." *Vasquez v. Bradshaw*, 345 F. App'x 104, 111 (6th Cir. 2009).

> A "reasonable probability" of difference does not mean "would have been different." The latter formulation puts a greater burden on the petitioner. To prevail on his claim as it was adjudicated, [Petitioner] was required not only to

39

show that his counsel's deficiency "undermine[d] confidence in the outcome," *Strickland*[,] 466 U.S. at 694, but to prove that a trial with competent counsel actually would have resulted in his acquittal.

*Vasquez*, 345 F. App'x at 112.

The Michigan Court of Appeals did not cite *Strickland* or approximate its "reasonable probability" standard. *Cf. Holland v. Jackson*, 542 U.S. 649, 655 (2004) ("We have held that such use of the unadorned word 'probably' is permissible shorthand when the complete *Strickland* standard is elsewhere recited."); *Woodford v. Visciotti*, 537 U.S. 19, 23-24 (2002) (holding that the state court's "opinion painstakingly describes the *Strickland* standard," so its "occasional shorthand reference to that standard by use of the term 'probable' without the modifier may perhaps be imprecise, but [cannot] be considered a repudiation of the standard"); *Vasquez*, 345 F. App'x at 112 ("While the appellate court did say 'reasonable probability' once, the use of the incorrect words cannot be regarded as anodyne 'shorthand[]' . . . .") (internal citation omitted).

Instead, the "court of appeals emphasized the inability to meet the prejudice prong, underscoring whether the trial 'would have been

different.'" *See, e.g.*, *Vasquez*, 345 F. App'x at 112.   Because the Michigan court "applied law that was contrary to clearly established federal law," this Court is "unconstrained by § 2254(d)(1) . . . [,] and *de novo* review is appropriate." *See id.* (quoting *Fulcher v. Motley,* 444 F.3d 791, 799 (6th Cir. 2006)).

On the merits, the Court finds that Petitioner was prejudiced by defense counsel's failures.   As noted above, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.   To determine whether Petitioner has carried his burden, the deficiency must be evaluated in light of the "totality of the evidence before the . . . jury." *Id.* at 695. When "the only evidence of the crime or the defendant's guilt is the testimony of the victim," the Sixth Circuit "has been especially willing to find prejudice from deficient representation because '[t]he lack of physical evidence confirming sexual activity meant that this was necessarily a close case at the trial level.'" *See Vasquez*, 345 F. App'x at 119 (quoting *Hodge v. Hurley*, 426 F.3d 368, 386 (6th Cir. 2005)); *see also Strickland*, 466 U.S.

41

at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors.").[5]

The prosecution's case rested on the credibility of P.S. All other evidence presented by the prosecution was indirect evidence offered to corroborate aspects of P.S.'s story. At most, the prosecution elicited testimony from Petitioner on cross-examination that he "spooned" P.S., that P.S. may have seen his penis from a distance and at an angle, and that Petitioner may have touched P.S.'s breast while sleeping, but that "[i]f I was sleeping, how do I know what I did?" This is not evidence of sexual assault or abuse.

Defense counsel's failure to consult with an expert resulted not only in a failure to adequately challenge P.S.'s testimony by highlighting the deficiencies in the investigatory process that may have rendered her testimony unreliable, but also a failure to adequately

---

[5] It should be noted that, in many cases, the testimony of the victim is the only direct evidence that the prosecution has to present. *See* Robin Charlow, *Bad Acts in Search of a* Mens Rea*: Anatomy of a Rape*, 71 FORDHAM L. REV. 263, 301 n.171 (2002) ("[I]n rape situations . . . there usually are no other witnesses or objective evidence beyond the conflicting testimony of the two people involved . . . ."). The case law should not be read to suggest that victims of alleged sexual assault should not be believed. To the contrary, the deductive and empirical attempts to demonstrate that the proportion of false rape reports "is either low or high" have failed. *See* David P. Bryden & Sonja Lengnick, *Criminal Law: Rape in the Criminal Justice System*, 87 J. CRIM. L. & CRIMINOLOGY 1194, 1298 (1997).

challenge the most significant corroborative evidence—the expert testimony of Cross. Defense counsel's cross-examination was essentially limited to three concessions: "some reports of sexual abuse by alleged victims turn out to be not truthful," Cross had never been asked to testify for a criminal defendant, and Cross's testimony was generic and "[n]ot about any specific case at all."

Defense counsel left unchallenged Cross's testimony that delayed disclosure of traumatic events is "very common" in both adults and children, and that it is "very common" for victims to be inconsistent about times, dates, who is present in the home, and where they lived at the time of the abuse. Instead, defense counsel conceded that, as a general matter, "obviously [Cross was] well verse [*sic*] in this in terms of what may be seen in these types of situations where a child claims she has been sexually abused."

"The missing evidence is not cumulative on these narrow admissions," because the "missing evidence is not a restatement of the general proposition of [P.S.'s] untrustworthiness or the inconsistencies already raised." *See, e.g.*, *Vasquez*, 345 F. App'x at 120. Dr. Okla proffered that she would have testified that Cross's expert opinion

43

regarding delayed disclosure and blurred memory is unsupported by science. *See also Gersten v. Senkowski*, 426 F.3d 588, 611 (2d Cir. 2005) ("[E]ven a minimal amount of investigation into the purported 'Child Sexual Abuse Accommodation Syndrome' would have revealed that it lacked any scientific validity for the purpose for which the prosecution utilized it: as a generalized explanation of children's reactions to sexual abuse, including delayed disclosure and blurred memory.")

Defense counsel's "attempts at impeachment all relied on the testimony of the state's witnesses and frequently were likely unconvincing because they relied only on the state's witnesses." *See Vasquez*, 345 F. App'x at 121. And based solely on Cross's and Dr. Okla's credentials, there is a reasonable probability that a jury would have found Dr. Okla to be more qualified than Cross to opine on the science regarding the psychology of child sexual abuse victims.

The prosecution, defense, and trial judge all noted at various times that P.S.'s interviews with the Wexford County Sherriff's office, Child Protective Services, Cross, and P.S.'s pretrial hearing and trial testimony contained multiple inconsistencies. To be sure, the Michigan Court of Appeals is correct that it is the province of the jury to decide

44

whether witnesses are credible. The Court is not finding that undercutting Cross's testimony *would* have led the jury to discredit P.S. Rather, the Court finds that there is a reasonable probability that the likelihood of a different result is substantial.

Cross's testimony regarding delayed disclosure and blurred memory was likely significant to whether the jury would excuse the inconsistencies in P.S.'s testimony. And there is a reasonable probability that the jury would have discredited Cross's expert testimony if they had heard from a defense expert such as Dr. Okla. Petitioner has demonstrated that but for his trial counsel's errors, there is a *reasonable probability* that his trial would have had a different outcome.

Petitioner has a constitutional right to be assisted by an attorney "who plays the role necessary to ensure that the trial is fair." *Strickland*, 466 U.S. at 685. Because defense counsel failed to play that necessary role here, the State must release or retry Petitioner.

## IV.   Conclusion

Petitioner was denied the effective assistance of counsel at trial in violation of the Sixth Amendment.   He is therefore being held in custody in violation of his constitutional rights.   Accordingly,

The petition for writ of habeas corpus (Dkt. 1) is GRANTED. Respondent is ORDERED to release Petitioner from custody imposed by the Judgment of Sentence entered in Wexford County Circuit Court in the underlying case within ninety days.   Nothing in this Opinion and Order should be construed as barring retrial.

IT IS SO ORDERED.

Dated: August 11, 2016                     s/Judith E. Levy
Ann Arbor, Michigan                        JUDITH E. LEVY
                                           United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 11, 2016.


                                           s/Kelly Winslow for
                                           FELICIA M. MOSES
                                           Case Manager

46